IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KASH REGISTER,

                          Petitioner,

         vs.

CLAUDE E. FINN, Warden, Deuel
Vocational Institution,

                       Respondent.

No. 2:08-cv-01202-JKS

MEMORANDUM DECISION

Petitioner Kash Register, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus Relief Under 28 U.S.C. § 2254. Register is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the Deuel Vocational Institution. Respondent has answered, and Register, through counsel, has replied.[1]

## I. BACKGROUND/PRIOR PROCEEDINGS

In December 1979, following a jury trial, Register was convicted in the Los Angeles County Superior Court of Murder in the First Degree (Cal. Penal Code § 187) in the commission of a robbery (Cal. Penal Code § 190.2(a)(17)(A)), with a use of fire-arm enhancement (Cal. Penal Code § 12022.5). Register was initially sentenced to a prison term of 25 years to life without possibility of parole. The trial court later struck the robbery special circumstances allegation and sentenced Register to an aggregate prison term of 27 years to life. Register does not challenge his conviction or sentence in this proceeding.

---

[1] Although he filed his Petition *pro se*, this Court appointed counsel *sua sponte*.

In May 2007 Register made his seventh parole-suitability appearance before the

California Board of Prison Terms ("Board").  After determining that Register would pose an

unreasonable risk of danger to society or threat to public safety if released from prison, the Board

found Register unsuitable for parole.  Parole was denied for a period of two years.  Register filed

a timely petition for habeas relief in the Los Angeles County Superior Court, which denied

Register relief in an unpublished, reasoned decision.  Registers's subsequent petition to the

California Court of Appeal, Second Appellate District, was summarily denied without opinion or

citation to authority.  The California Supreme Court summarily denied review without opinion or

citation to authority on May 21, 2008.  Register timely filed his Petition for relief in this Court on

June 4, 2008.

As summarized by the Board, the facts underlying the commitment offense were:

In the early afternoon hours of April 6th, a 78-year-old victim, Jack
Sasson, S-A-S-S-O-N, left his apartment to go to his automobile which was
parked in the carport at 1937 Shenandoah in Los Angeles.  That inmate Register
approached the victim, who was in his automobile, and demanded money.  Mr.
Register then fired an unknown number of shots into the victim, estimated by
witnesses as three shots, taking the victim's wallet with one hundred dollars, and
leaving the scene.

While leaving the scene, two witnesses were across the street.  After
leaving the scene, Mr. Register returned a few seconds later, firing an unknown
number of shots into the victim, and then fleeing.  One witness in pursuit of him
for about three blocks, until Mr. Register turned on the witness, Eliot Singleton,
pointing a handgun at the witness who then ended his pursuit subsequently losing
sight of Mr. Register.

Witness Singleton testified that he was working as a painter across the
street when he heard the initial shots.  Then looking out the window, quote, "I saw
a man.  He was being hit like somebody was trying to take something from him.
And then I seen the man being thrown on the ground.  Mr. Register was seen right
on the outside of the car reaching inside the car.  I seen him sort of like trying to
reach inside his jacket for something, and then I seen him throw the man on the
ground, pull him out of the car and then throw him on the ground.  They were
tussling, and then he reached inside his pocket and he got something.  I think it
was a wallet.  And he took off and ran.  He hit him.  He went inside the man's

clothes trying to get something out of the man's pocket.  I think it was his wallet, a dark wallet.  I seen him with the gun pointed at me.  I followed this man for a couple of blocks and this man stopped and pointed the gun at me," unquote. Singleton also testified that Mr. Register was wearing a reddish-purple-maroon-colored shirt.

Witness, Brenda Anderson, testified that she heard the initial shots as she was about to get into her shower, across the street from the scene of the present offense.  "I heard shots and I looked out my window.  I see somebody running in between some apartments, run back and shoot two more times.  But I seen, I heard the shots.  He was firing at a blue car, and he took off across the street.  I think I know him.  I seen him before.  I went to school with him.  I identified him as the one I saw running from the scene."

The victim was transported to the Los Angeles New Hospital where he subsequently identified Mr. Register from a photo line-up pointing to Mr. Register's photograph.  He was unable to speak because of injuries.  The victim died on April 27th, 1979.

Witness Anderson who identified Mr. Register, as having gone to Hamilton High School with him, also identified Mr. Register from a photo line-up, as did witness, Eliot Singleton.

A search warrant was obtained, and on April 10th, Mr. Register was arrested as he was about to enter his vehicle in the front of his residence.  A maroon shirt matching the description given by the two witnesses was recovered. Neither the gun nor the wallet was recovered.

An autopsy was performed on April 28th.  The coroner's report indicating that the cause of death was multiple gunshot wounds to the abdomen, chest and left ribs.[2]

## II.  GROUNDS RAISED/DEFENSES

In his Petition, which incorporates the Petition for Review filed with the California Supreme Court, Register raises a single ground cognizable by this Court in this proceeding:  the determination that he posed an unreasonable risk of danger to society or threat to public safety if

---

[2] Docket No. 21-1, pp. 41-44.

released from prison was unsupported by some evidence.[3]  Respondent does not assert any

affirmative defense.[4]

## III.  DISCUSSION

In finding Register unsuitable for parole, the Board held:

**PRESIDING COMMISSIONER KUBOCHI:**  We're back on record, and it's 1:05 p.m., in the Parole Suitability Hearing of Kash Register, and I'm going to announce the decision of the Panel and state the reasons.  And before doing so, I'd like to state for Mr. Kash and the record, our careful review of Title 15, Section 2281.  And that entire section is entitled, Determination of Suitability. Subdivision A states that regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if, in the judgment of the Panel, the prisoner will pose an unreasonable risk of danger to society if released from prison.

Subdivision B of Section 2281 states or describes information that may be considered by the Panel.  And it says that all relevant, reliable information available to the Panel shall be considered for determination of suitability for parole.  And there is an express sentence that states that circumstances which taken alone, may not firmly establish unsuitability for parole, but may contribute to a pattern which results in a finding of unsuitability.

Subdivision C lists factors or circumstances tending to show unsuitability. And there is an express statement that says the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the Panel.  And it goes on to list six factors or six circumstances. And there are various subdivisions within each one.

And Subdivision D is factors or circumstances tending to show suitability. That subdivision also has the similar language of Subdivision C that says that if the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the Panel.

And it lists circumstances tending to indicate suitability include no juvenile record, stable social history, signs of remorse, motivation for the crime.

---

[3] Except as discussed in Part III, below, the extent to which Register argues the decision of the Board was contrary to California law, those arguments are beyond the purview of this Court in a federal habeas proceeding.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

[4] *See* Rules—Section 2254 Cases, Rule 5(b).

Number five does not apply because it is for the battered partner syndrome. Number six is lack of criminal history. Seven is age. Eight is understanding of plans for the future. And nine is institutional behavior.

And I took particular note, Mr. Register, because a lot of emphasis has been placed and a lot of discussion has been made of the accomplishments that you have made in prison, the certification for marketable skills. And in listening to your presentation, you place heavy reliance on the marketable skills. However, in regard to institutional behavior, there's two factors to consider. One, is that it is but one of eight factors listed in Subdivision D. And, two, your institutional behavior includes 12 115s, two of which involve violence and weapons, and two that were defying direct orders, and four involved miscounts which, in this Panel's evaluation, is the same as disobeying orders. So, there's six for disobeying orders and two for weapons or violence out of the 12 you've had. You've also had 17 128s. And those have to be considered in regard to the institutional behavior.

And at this time, we are finding you not suitable for parole. And find that you would pose an unreasonable risk of danger to society or threat to public safety if released from prison. In that assessing all of the factors in Section 2281, the factors of unsuitability far outweigh those factors of suitability. And I will address many of those in specifics.

In this particular case, this murder was carried out in an especially cruel and callous manner, in that the victim was 78 years old and had a hearing impairment. And of significant importance was the fact that this victim was in the safety of his apartment in the area of his carport where everybody would like to feel that they are safe from predators and predatory crimes, especially crimes of violence.

And all he did was get into his car in his carport, and he was confronted by you. And he was shot twice. He was robbed of his wallet. There were eyewitnesses to that scene. And he was particularly vulnerable in view of the fact that he was doing what anybody ought to do, and that is move about in the area of their home and residence, feeling safe and secure. And he was robbed at gunpoint. He was clearly unarmed, 78, hearing impaired, as I've indicated.

And there are further aggravating facts concerning this because you were not satisfied when you shot him two times, when there was clearly opportunities to cease in life-threatening acts, you carne back and shot him two more times after leaving the scene, according to the eyewitnesses. And this is a particularly troubling crime in that it demonstrates that it was committed by somebody that had no moral compass at all. And we find that the motivation for the murder was inexplicable and very trivial in relation to the offense.

In regard to your prior record, you had a juvenile record going back to 14 years old, and it involved a switchblade knife, petty theft, grand theft person, and theft of the wheels from tire rims. And that you were placed back onto juvenile probation in May of 1978, and this crime happened in the early part of 1979, April of 1979, less than a year after your fourth contact with the juvenile authorities.

5

We find that there was an escalating pattern of criminal conduct, and that you had failed previous grants of juvenile probation.  And your Probation Report documents that probation made intense efforts to try to redirect the path that you were on.  You failed to profit from society's attempts to correct your criminality through that juvenile probation.

We looked at your institutional behavior, and we note the vocational skills that you've obtained, which is a positive.  Your marketable skills in several different vocations, one of those include the masonry that you wish to pursue if released from prison.

However, again, we look at the 115s.  And in regard to that, it's of particular note that the murder occurred in 1979, and your last 115 was in 1995, and that spanned a period of 16 years of serious offences.

That is, all 115s committed in prison are serious because they show a disregard for the rules and with the administration of prison.  And in addition to those 115s over that 16-year period, you had 17 additional 128s.  And I believe your most recent 128 extended into the  time period of 2000.

In regard to further findings, we find that you continue to need therapy in order to face, discuss, understand, and cope with stress in a non-destructive manner.  And until progress is made, that you continue to be unpredictable and a threat to others.  That therapy in a controlled setting is needed.  But motivation and amenability or receptiveness are questionable at this time. The gains that you've demonstrated must be maintained over an extended period of time, in view of the life crime and the serious nature of that offense.

And it appears to this Panel and listening to everything that you've said, that you're in denial as to the causation factors in regard to the homicide for which you were convicted.  And that you've demonstrated no insights as to involvement in such a serious murder.

In a separate decision, the Hearing Panel finds that it is not reasonable to expect that parole would be granted at a hearing in the next two years.

Sir, as I have indicated, this crime is among the most serious crimes that come before this Panel, in that the victim was 78 years old, hearing impaired.  And it was clear that the manner in which this crime was carried out when that person was in the safety of his apartment and carport area, was predatory in nature.  And that he was 78 years old, he was hearing impaired, and that you were armed with a firearm at the time.

You clearly had an opportunity to carry out the theft from this individual without resorting to violence, because he could have easily been overpowered.  Instead, he was shot on two separate occasions.  The eyewitnesses observed you after two shots were heard to come back to where the victim was and fire two more shots.

We've also considered the motivation, or lack thereof, for such a serious crime, in regard to the, as I've indicated, the taking of a life during the intent to obtain financial gain.  We've looked at your juvenile record in that regard.  In regard to the factors that we've described, going back to the age of 14, sir, in

regard to the factors tending to show suitability, you did have a juvenile record, so that's not in your favor.

You didn't have a stable social history in that as early as 16 years old, juvenile authorities tried to intervene and assist your mother in redirecting the path that you had chosen.

And in regards to signs of remorse, it appears, as I indicated, I'd like [*sic*] go into the Probation Report of 1975, when you were 14 years old.  Law enforcement caught you with a switchblade knife, and your assessment of that was, "I just had a switchblade knife, that's when I was in the ninth grade, I didn't know a switchblade knife was illegal to carry."

In June of 1977, you were arrested for shoplift [*sic*] and a petition at juvenile authorities was sustained.  And I'm reading right out of the Probation Report with no paraphrase, defendant denies the allegation, stating to the probation officer, quote, "I was just in the store with my partner.  We had just finished talking in the aisle.  I had on some corduroy jeans.  There were some earrings that had hooked onto my pant leg and slipped on in my jeans."

In regard to July 1977, grand theft person.  And the definition of grand theft person, pursuant to Penal Code Section 487.2, is taking property from the immediate vicinity of another.  The petition was sustained, and juvenile authorities, and I'm reading it right out of the Probation Report, defendant denies the allegation stating that he was walking down a store aisle when he saw a wallet on the ground.  Then he went about a block from his job, and the man from the store told him to stop.  He did and he gave the wallet to the man.  He maintained that the only reason that he was arrested was because he was in a white neighborhood and had on corduroy jeans, a cap, and was wearing an earring.

Before this life crime, sir, there's documentation in regard to denying responsibility for the acts that you commit.  And in regard to the suitability, signs of remorse are a factor in suitability.  But, and we're holding against you, the fact that you elected your right not to talk about the case, but we didn't hear anything about remorse in one way, shape or other, or any insights as to the causation factors that would result in such a serious crime.

The motivations for the crime is another important factor to be assessed by the Panel.  Lack of criminal history.  That's not in your favor.  And so, we're left with institutional behavior and understanding for future plans.

And, sir, as I've indicated in assessing all of these factors, all I can do is recommend that you look at the entire record of this case, including your juvenile record, and start reflecting on these things.  And that's why in this separate decision, we have chosen the two years for you to reflect on these things.  The Los Angeles County Superior Court imposed the sentence.  We don't deal with punishment.  Twelve of your peers from that county found you guilty.  We don't go into fact finding as to your guilt.  That's why we don't hold against you your right to talk about the case.  But in looking at everything, going back to the age of 4, there's no acceptance of responsibility, even though you have been adjudicated in the past.

And yet, this panel is faced with releasing somebody out into the community that throughout all their adjudications, has never accepted responsibility.  And I've assessed all of the factors in 2281, sir.  And at this point in time it far outweighed the factors of unsuitability, far outweigh it.  You're the only person that can look at all these factors and make the effort by introspection and thinking about it and to convince a future Panel that you're a danger to society.  That's all I can say.  Commissioner?

> **DEPUTY COMMISSIONER HERNANDEZ:**  Good luck to you, sir.[5]

As relevant to the issue properly before this Court, Register argues that the Board's decision impermissibly relied upon the underlying commitment offense.  In denying Register relief, the Los Angeles Superior Court held:

> [. . . .]  The record reflects that on April 6, 1979, [Register] approach the 78-year old, hearing impaired victim in the parking garage of his apartment complex.  [Register] demanded money and fired three shots at the victim.  Then, he took the man's wallet and fled.  According to a witness, [Register] returned a few seconds later and shot the victim two more times. The witness attempted to chase [Register], but he got away.  This witness stated that [Register] beat the victim before shooting.  The victim died three weeks later of multiple gunshot wounds to the abdominal area, chest and ribs.

> The Board found [Register] unsuitable for parole after a parole consideration hearing held on May 18, 2007.  [Register] was denied parole for two years.  The Board concluded that [Register] was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety.  The Board based its decision on several factors, including his commitment offense.  The nature of the commitment offense may indicate that a prisoner poses an unreasonable risk of danger to society when the offense is especially heinous, atrocious or cruel.  (Cal. Code Regs., tit. 15, §2402, subd. (c)( 1); *Rosenkrantz* at 682-683.)  In this case, the Board found that the commitment offense was especially heinous because, "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."  (Cal. Code Regs., tit. 15, §2402, subd. (c)(1 )(D).)  This means that "the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of that offense."  (*In re Scott* (2004) 119 Cal.App4th 871, 891.)  An offense is more aggravated or violent when it involves severe trauma, "as where death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or

---

[5] Docket No. 21-1, pp. 80-85 through Docket No. 21-2, pp. 1-5.

actions calculated to induce terror in the victim." (*Id.* at 892.)  Here, [Register] beat the significantly older, hearing impaired victim before shooting him multiple times in the chest and stomach.  The victim did not succumb to his injuries for almost three weeks.  The Board found this crime exceptionally callous because the victim was unarmed and [Register] could easily have intimidated or overpowered him without resorting to murder.  Because [Register] committed the murder in more aggravated manner than ordinary and used more violence than was necessary to obtain the victim's wallet, he has demonstrated a greater risk of danger to society if released from prison than ordinary first-degree murderers.

The Board was concerned that [Register] lacks insight into the nature and magnitude of the offense.  (Cal. Code Regs., tit. 15, §2402, subd. (d)(3).)  The Presiding Commissioner stated, "You have demonstrated no insight as to involvement in such a serious murder."  (Reporter's Transcript, May 18, 2007, p. 58.)  The Board recommended further self-help programming to understand and cope with stress in a non-destructive manner, however they noted, "that therapy in a controlled setting is needed, but motivation and amenability or receptiveness are questionable at this time."  (Id at 57.)   Until [Register] develops a greater understanding and sense of remorse, he continues to be an unpredictable risk of danger to society.

Accordingly, the petition is denied.[6]

After briefing in this case was completed, the United States Court of Appeals for the Ninth Circuit, sitting en banc, decided *Hayward v. Marshall*.[7]  This Court must decide the case on the law as it exists at the time it renders its decision and, if the law changes while the case is pending, this Court applies the new rule.[8]  Thus, although it establishes a new rule, the holding in *Hayward* is controlling.

In this case, this Court "need only decide whether the California judicial decision approving the [Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or 'was based on an unreasonable determination of the

---

[6] Docket No. 21-2, pp. 2-3.

[7] 603 F.3d 546 (9th Cir. 2010) (en banc).

[8] *See Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 281-82 (1969); *Lambert v. Blodgett*, 393 F.3d 943, 973 n.21 (9th Cir. 2004).

facts in light of the evidence.'"[9]  By its reference to 28 U.S.C. § 2254(d), the Ninth Circuit

implicitly, if not explicitly, directed this Court to apply § 2254(d) to the decisions of the

California Supreme Court, using the same standards as are applied to the determination of the

law as established by the United States Supreme Court.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding."[10]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[11]  When a claim falls under the "unreasonable

application" prong, a state court's application of Supreme Court precedent must be objectively

unreasonable, not just incorrect or erroneous.[12]  The Supreme Court has made clear that the

objectively unreasonable standard is a substantially higher threshold than simply believing that

the state court determination was incorrect.[13]  Consequently, it appears that under the mandate of

---

[9] *Hayward*, 603 F.3d at 563 (footnotes citing 28 U.S.C. § 2254(d) omitted).

[10] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[11] *Williams*, 529 U.S. at 412.

[12] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[13] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

*Hayward*, this Court must canvas and apply California law as it existed at the time of the state court decision to the facts in the record as presented to the state court.

The mandate in *Hayward* is that this Court must review the decisions of state courts applying state law—in effect serving as a super-appellate court over state-court decisions.  This requirement is in tension with the holdings of the Supreme Court.  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.[14]  "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[15]  This principle applied to federal habeas review of state convictions long before AEDPA.[16]  A federal court errs if it interprets a state legal doctrine in a manner that directly conflicts with the state supreme court's interpretation of the law.[17]

Respondent argues that California prisoners have no liberty interest in parole, and that if they do, the only due process protections available are a right to be heard and a right to be

---

[14] *See Estelle*, 502 U.S. at 67-68 (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton*, 497 U.S. at 653 (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[15] *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[16] *See Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

[17] *See Bradshaw*, 546 U.S. at 76-78 ("Because the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence was erroneous.").

informed of the basis for the denial.[18]  That is, Respondent contends that there is no due process

right to have the result supported by sufficient evidence.  Because it is contrary to binding Ninth

Circuit law,[19] Respondent's argument is without merit.

At the time that the Board and the California courts rendered their decisions, the

California "some evidence" rule was embodied in *In re Rosenkrantz*[20] and *In re Dannenberg*.[21]

Subsequently, the California Supreme Court, applying *Rosenkrantz* and *Dannenberg*, decided *In*

*re Lawrence*[22] and *In re Shaputis*.[23]

In *Rosenkrantz*, the California Supreme Court held:

[. . . .]  Due process of law requires that [the Board's] decision be
supported by some evidence in the record.  Only a modicum of evidence is
required.  Resolution of any conflicts in the evidence and the weight to be given
the evidence are matters within the authority of the [Board].  [. . . .]  [T]he precise
manner in which the specified factors relevant to parole suitability are considered
and balanced lies within the discretion of the [Board]. . . .  It is irrelevant that a
court might determine that evidence in the record tending to establish suitability
for parole far outweighs evidence demonstrating unsuitability for parole.  As long
as the [Board's] decision reflects due consideration of the specified factors as
applied to the individual prisoner in accordance with applicable legal standards,
the court's review is limited to ascertaining whether there is some evidence in the
record that supports the [Board's] decision.[24]

---

[18] *See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1,
15 (1979).

[19] *See Pirtle v. California Bd. of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010);
*Cooke*, 606 F.3d at 1213-14 (citing *Hayward*, 603 F.3d at 561-64); *Pearson*, 606 F.3d at 610-11
(same).

[20] 59 P.3d 174 (Cal. 2002).

[21] 104 P.3d 783 (Cal. 2005).

[22] 190 P.3d 535 (Cal. 2008).

[23] 190 P.3d 573 (Cal. 2008).

[24] *Rosenkrantz*, 59 P.3d at 218.  Quoted with approval in *Shaputis*, 190 P.3d at 585.

The California Supreme Court then held:

> The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. (Citations omitted.)  Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant.  [. . . .]
>
> In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.  Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. . . ."  (Pen.Code, § 3041, subd. (a).)  "The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.)  [¶]  Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date." (Citation omitted.)[25]

In *Dannenberg* the California Supreme Court explained:

> [. . . .]  So long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by "some evidence" in the record before the Board [citing *Rosenkrantz*], the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders. Section 3041 does not require the Board to schedule such an inmate's release when it reasonably believes the gravity of the commitment offense indicates a continuing

---

[25] *Id.* at 222; *see Shaputis*, 190 P.3d at 584-85 ("The record supports the Governor's determination that the crime was especially aggravated *and*, importantly, that the aggravated nature of the offense indicates that the petitioner poses a current risk to public safety." (emphasis in the original)).

danger to the public, simply to ensure that the length of the inmate's confinement will not exceed that of others who committed similar crimes.[26]

The California Supreme Court then held:

> Thus, there clearly was "some evidence" (citing *Rosenkrantz*) to support the Board's determination that Dannenberg's crime was "especially callous and cruel," showed "an exceptionally callous disregard for human suffering," and was disproportionate to the "trivial" provocation.  Accordingly, under *Rosenkrantz,* the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date.[27]

The Board must, however, "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.[28]  The Board "may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction evidences."[29]  In *Lawrence*, however, the California Supreme Court rejected the argument "that the aggravated circumstances of a commitment offense inherently establish current dangerousness," holding:

> [W]e conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.[30]

---

[26] *Dannenberg*, 104 P.3d at 795.

[27] *Id.* at 803.

[28] *Id.* at 786-87, 802-803; *see Rosenkrantz*, 59 P.3d at 222.

[29] *Dannenberg*, 104 P.3d at 803 n.16 (citing *Rosenkrantz*, 59 P.3d at 219).

[30] *Lawrence*, 190 P.3d at 554-55; *see Cooke*, 606 F.3d at 1214.

This Court must, therefore, determine whether the decisions of the California courts upholding the Board's denial of parole complied with California law as expressed in *Lawrence* and *Shaputis*.  Because state court judgments carry a presumption of finality and legality, Register has the burden of showing by a preponderance of the evidence that he merits habeas relief.[31]  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[32]  This presumption applies to state trial courts and appellate courts alike.[33]  Both the subsidiary findings on the applicable factors and the ultimate finding of some evidence constitute factual findings.[34]

Register argues in his Traverse that the finding of the Board and the Los Angeles County Superior Court that the crime was committed in the course of the robbery was contrary to the findings of the trial court and improper.  This Court disagrees.  First, under California law, the Board "may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction evidences."[35]  Second, Register was neither acquitted of robbery (as contended in the Petition), nor did the trial court find that the crime was not committed in the course of a robbery (as contended in his Traverse).  The record referred to by Register clearly and unequivocally shows that the trial court, *in the exercise of its discretion*, struck the special circumstance finding of the jury in the interest of justice under Cal. Penal Code § 1385, for the

---

[31] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[32] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[33] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

[34] *Cooke*, 606 F.3d at 1216.

[35] *Dannenberg*, 104 P.3d at 803 n.16 (citing *Rosenkrantz*, 59 P.3d at 219).

purpose of imposing sentence.[36]  Nothing in the trial court's order indicates that the trial court

found the murder was not committed in the course of a robbery.  Register's argument is without

merit.

With respect to the underlying commitment offense, the applicable regulation provides:

(1) Commitment Offense.  The prisoner committed the offense in an especially
heinous, atrocious or cruel manner.  The factors to be considered include:
(A) Multiple victims were attacked, injured or killed in the same or
separate incidents.
(B) The offense was carried out in a dispassionate and calculated manner,
such as an execution-style murder.
(C) The victim was abused, defiled or mutilated during or after the
offense.
(D) The offense was carried out in a manner which demonstrates an
exceptionally callous disregard for human suffering.
(E) The motive for the crime is inexplicable or very trivial in relation to
the offense.[37]

The evidence clearly supports a finding that this case falls within the scope of (1)(C),

(1)(D), and (1)(E), and probably (1)(B).  Under California law, a court neither re-weighs the

evidence nor substitutes it's discretion for that of the Board.  Judicial review of a decision

denying parole is "extremely deferential."[38]  Thus, under *Rosenkrantz* and *Dannenberg*, this

Court could not say that the decision of the Los Angeles County Superior Court was contrary to,

or involved an unreasonable application of California law at the time it was decided, or was

based on an unreasonable determination of the facts in light of the evidence.  On the other hand,

because *Hayward*, *Pearson*, and *Cooke* require that *Lawrence* and *Shaputis* be applied, this Court

---

[36] Docket No. 23, p. 13.

[37] Cal. Code Regs., tit. 15 § 2281(c).

[38] *Rosenkrantz*, 59 P.3d at 210.

16

must look to determine whether there was some factor in addition to the underlying commitment offense to support denial of parole.

As the Los Angeles Superior Court noted, in addition to the underlying commitment offense, the Board found that Register lacked insight into the nature and magnitude of his crime. This, standing alone, if supported by evidence, is a sufficient additional factor to support a determination that Register posed an unreasonable risk of danger to society or a threat to public safety.[39]   Register argues that this determination is unsupported by evidence and, as an attempt to make him admit guilt in spite of his claim of innocence, is contrary to California law.[40]   Although this is a question of state law normally beyond the purview of this court, as a limitation on the factors the Board may consider, it is an integral part of the California "some evidence" analysis.[41]

At the outset, Register was advised:

---

[39] *See Shaputis*, 190 P.3d at 575, 581, 585.

[40] *See In re Palermo*, 90 Cal. Rptr.3d 101, 110 (Cal. App. 2009), *overruled on another point in In re Prather*, 234 P.3d 541 (Cal. 2010).
15 Cal. Code Regs., tit 15, § 2236 "Prisoner's Version" provides:
> The facts of the crime will be discussed with the prisoner to assist in determining the extent of personal culpability.  The Board shall not require an admission of guilt to any crime for which the prisoner was committed.  A prisoner may refuse to discuss the facts of the crime in which the instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner.  Written material submitted by the prisoner under § 2249 relating to personal culpability shall be considered.

Cal. Penal Code § 5011 provides:
> (b)  The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed.

[41] *See Pirtle*, 611 F.3d at 1020 (noting that the "'some evidence' analysis is shaped by the state regulatory, statutory, and constitutional  law that governs parole suitability determinations in California."); *Cooke*, 606 F.3d at 1213 (same, citing *Rosenkrantz*, 59 P.3d at 201-03)).

> **PRESIDING COMMISSIONER KUBOCHI:**  [. . . .]
> You are not required to admit or discuss the murder case with us.
> However, you do understand that this panel accepts as true the findings of the Los
> Angeles County Superior Court?
> **INMATE REGISTER**:  Yes.[42]

Register points to the following statement as indicative that the Board did, in fact, rely on his refusal to discuss the crime:  "But, and we're holding against you, the fact that you elected your right not to talk about the case, but we didn't hear anything about remorse in one way, shape or other, or any insights as to the causation factors that would result in such a serious crime."[43]  In addition to the statement made at the beginning, immediately after the statement quoted by Register, Presiding Commissioner Kubochi reiterated the Board could not hold the fact he refused to discuss the underlying crime against him.

> [. . . .]  That's why we don't hold against you your right to talk about the
> case.  But in looking at everything, going back to the age of 4, there's no
> acceptance of responsibility, even though you have been adjudicated in the past.[44]

Taken in context this Court views the statement cited by Register as an inadvertent misstatement and, as such, is not entitled to any significant weight.  That being said, does not end the inquiry.  Here, Register maintains that he is innocent.  A position it appears from the record that he has steadfastly maintained throughout his post-conviction proceedings.  While it is true, as was stated at the beginning of the hearing, that the Board must accept as true the findings of the trial court as to the underlying offense, it is also clear from the concluding paragraph of the decision that the Board's decision turned on Register's refusal to accept responsibility for the

---

[42] Docket No. 21-1, p. 38.

[43] Docket No. 21-2, p. 3.

[44] Docket No. 21-2, p. 4.

18

crime.  Thus, although the law prohibits the Board from requiring a prisoner to confess to the

crime, unless the prisoner "confesses" to the crime, it is impossible for the prisoner to accept

responsibility for it.  Consequently, applying the rationale of the Board in this case means that a

prisoner who is actually innocent, or believes himself or herself to be innocent, must nonetheless

confess.  A person cannot accept responsibility for an act that the person did not do, or cause to

be done.  As Register argues, to require a prisoner to accept responsibility under those

circumstances has the effect of coercing a prisoner to "confess," something California law

specifically provides a prisoner is not required to do as a condition of being granted parole.  At

the parole hearing, Register testified as follows:

> And no point of me declaring my innocence and my trying to minimize the
> seriousness of a innocent human being losing his life in a senseless crime, I fully
> understand the hardship the victim's family went through and are still suffering.  I
> have lost several family members since my incarceration, and the hurt is
> indescribable.  I have always took full responsibility for my juvenile actions.[45]

There is little, if anything, else that Register could do to express remorse or accept responsibility.

In the December 2006 Mental Health Evaluation, the clinical psychologist assessed

Register's dangerousness as follows:

> Research has been done on determining dangerousness and/or recidivism
> when inmates have been released on parole.  The research has identified risk
> factors and positive factors that can aid in determining the suitability for parole.
> These factors are based upon correlational data, which means that they do not
> directly predict success or failure.  Considering this, it is important that this
> assessment be merely one aspect in the process of deciding whether or not parole
> is indicated in this case.  In addition, the risk factors and protective factors
> described below are not cumulative in nature.  They can be understood as
> historical, characterological, and/or current.
> Inmate Register possesses two risk factors that are indicative of
> individuals with future recidivism.  The first is a substance abuse history.  As

---

[45] Docket 21-1, p. 77.

mentioned previously, there was a brief period during Inmate Register's adolescence that he experimented with marijuana. In addition, there is one disciplinary CDC-IIS during his time in CDCR for possession of marijuana. His history of crime as a juvenile is also a risk factor in determining suitability for parole. As a teen, he was charged with possession of a switchblade, shop lifting, and grand theft auto. He successfully completed probation in regards to the initial crimes; however, due to the arrest for the instant offense he was unable to complete probation successfully for the last incident. Aside from the charge for which he is imprisoned, his only history of violent behavior involves one disciplinary in 1989 for mutual combat. Considering his lengthy incarceration and the age of conviction, he should be commended for his ability to manage his anger and conflicts.

Inmate Register possesses several protective factors that are indicative of lower rates of dangerousness in the future. He has been married. Individuals who have been married show better adjustment on parole than those who have not. He is 46-years of age. Violence in men tends to attenuate past the age of 35. He has been disciplinary free for approximately 12-years. Historically, he has had only one disciplinary for a violent incident. Inmate Register has social support from his mother and brother. Inmates who parole with an extended support network tend to perform better when they reenter the community than those who are alone. As mentioned previously, his vocational plans are viable and work skills are marketable. Even though he does not have a history of substance dependence, he remains committed to sobriety and has participated in Alcoholics Anonymous while incarcerated.

Finally, individuals who demonstrate insight and remorse into their life crime tend to have lower rates of violence in the community. In this instance, Inmate Register denies accountability for the said offense. He states that he continues to maintain his innocence. Considering this, it is important to determine the ability for this inmate to demonstrate insight and remorse into his negative life behaviors. In terms of his juvenile crimes, Inmate Register has gained a life perspective on his behavior. He believes that he was raised in a stable family with strong moral values. Approximately at the age of 14, he began to associate with a negative peer group. At the same time, his mother was single and supporting a family. Because of her work schedule, there were periods of time that he went unsupervised. For a period of two years, he continued to associate with peers who were engaging in illegal activity. He was arrested three times, completed his probation until he was then rearrested for the said offense. According to his reports, he had a period of one year where he had goals for his future, was seeking employment, and was no longer engaging in negative peer relations. He is able to remark about the negative impact his behavior had on society. He understands that stealing is wrong and in his words, he states, "I got things stolen from me, I didn't like it one bit." His description of this period of his life shows that he has the ability to think about issues from a causative perspective and experience empathy.

20

Assessment of dangerousness within the controlled setting of an institution is seen as below average in comparison with other inmates.  Assessment of dangerousness if released into the community is also seen as below average in comparison with other inmates.[46]

The clinician then made the following observations/comments/recommendations:

Inmate Register has served over 27-years in prison and to this day he maintains his innocence for his life crime.  Prior to his arrest at age 18, he acknowledges a brief history of juvenile crime.  According to his reports, he had started making positive choices in an effort to complete his education and gain lawful employment.  He was sentenced to life at age 18 for the murder of a 78-year-old man.  At the age of 18 to be given a life sentence, regardless of guilt, it is reasonable to assume a period of difficulty in adjusting to incarceration.  Looking back over his early prison history, he received a total of 12 disciplinaries.  Of those disciplinaries, one was for a violent altercation and another for possession of marijuana.  The remainder of his behavioral problems seem to reflect an inability or refusal to program.  From 1995 his prison record is clean of any disciplinaries.  When asked about this change, he stated that the shift in his thinking occurred a few years prior to that.  He attributes this shift to maturity and in his words, "Me knowing what I want for my future."

He has shown significant motivation in self-help, acquiring marketable skills, and maintaining a disciplinary-free record since that time.  He states that since incarceration, he never gave up hope for his release, however, with age he learned more adaptive ways of channeling his frustrations within the system.  He realized that if he were to continue to have minor infractions, he may have never been given the chance to parole.

Inmate Register is a quiet, middle aged, male who has learned how harsh the consequences can be for engaging in criminal activities.  He has taken a solitary approach to self-improvement.  He appears to make conscious choices about where to focus his energy.  He should be commended for his dedication to self-help programs, his participation in Alcoholics Anonymous and the viability of his parole planning.  As stated previously, his assessment of dangerousness if paroled into the community is seen as below average compared with other inmates in his situation.  In conclusion, there are no mental health and/or psychological issues that would preclude routine release planning in this case.[47]

---

[46] Docket No. 21-2, pp. 71-72.

[47] Docket No. 21-2, p. 72.

This Court recognizes that the Board is not bound by the opinion of the clinical psychologist and has wide discretion in making its own evaluation.  This Court also recognizes that, to a significant extent, that evaluation is subjective.  The independent evaluation must, however, be based upon some relevant evidence.  Referring to the probation reports,[48] the Board discusses Register's denial of responsibility for the crimes committed as a juvenile: one in 1975, and two in June and July 1977.[49]  The Board refers to no other evidence to support its determination that Register declines to accept responsibility.  The relevance of obviously lame excuses, made by a person then 14 or 16 years old, to that person's acceptance, some 30 years later, of responsibility for his or her earlier actions is simply too remote to be of any probative value.  This is particularly true when, as in this case, the evidence in the record clearly indicates that the person has, in fact, accepted responsibility for his or her earlier transgressions.  Thus, the evidence does not support the finding that Register lacks insight, refuses to accept responsibility, or has failed to express remorse.

Because the state court's decision does not reveal which of the other factors, other than the underlying conviction and the lack of insight, supported denial of parole, this Court will examine each of the other factors stated by the Board in denying Register parole.[50]

---

[48] The probation reports are not included in the record.  The only probation report specifically identified is the 1975 report.  In the absence of any indication to the contrary, this Court assumes the probation reports referred to for the two 1977 crimes were prepared in 1977 in connection with those incidents.

[49] Docket No. 21-2, pp. 2-3.

[50] *Cooke*, 606 F.3d at 1214.

The Board referred to Register's institutional behavior, noting that he had 12 115's,[51] two of which involved violence and weapons, and two as defying direct orders, the last in 1995. The Board also noted that Register had 17 less serious 128's, the last in 2000.[52] The sole disciplinary action involving violence was in 1989, 16 years prior. Given the lapse in time and the intervening 12-year period that Register had been discipline-free, Register's institutional misbehavior is too remote in time to support a finding of current dangerousness.[53]

The Board also referred to Register's juvenile history, consisting of a switchblade knife possession, petty theft, grand theft person, and the theft of the wheels from tire rims. Register's juvenile history started at age 14 and ended in 1979, nearly 30 years prior to the hearing. There is nothing the juvenile history recited by the Board that indicates escalating violence as contemplated by the Board's regulations.[54] That fact, coupled with the 30-year lapse since the last incident, renders Register's juvenile record of no probative value to support a finding of current dangerousness. Thus, Register's juvenile history does not support a finding of current dangerousness.

---

[51] A CDC 115 "Rules Violation Report" is issued when misconduct is believed to be a violation of law or is not minor in nature. Cal. Code Regs., tit. 15, § 3312(a)(3). CDC 115's are further classified as either "Administrative Rule Violations," Cal. Code Regs., tit. 15, § 3314, or "Serious Rule Violations," Cal Code Regs., tit. 15, § 3315.

[52] A CDC 128-A "Custodial Counseling Chrono" is issued for minor misconduct. Cal. Code Regs. tit. 15, § 3312(a)(2). The Transcript does not indicate what those 128's were for.

[53] *See Cooke*, 606 F.3d at 1215.

[54] Cal. Code Regs., tit. 15, § 2402(c)(2) (previous history of inflicting or attempting to inflict serious injury on a victim); *See In re Cerny*, 101 Cal. Rptr.3d 200, 207-08 (Cal. App. 2009).

The Board found that Register needed additional "therapy in order to face, discuss, understand, and cope with stress in a non-destructive manner."[55]  The Board failed to identify any evidence that supports that conclusion.  Indeed, the psychological report directly contradicts the Board's conclusion.  Thus, in the absence of some evidentiary support, the bare assertion that Register needs additional therapy cannot be reasonably viewed as providing evidence to support a finding of current dangerousness.[56]

Applying *Lawrence* and *Shaputis*, this Court finds that the decision of the Los Angeles County Superior Court was contrary to, or involved an unreasonable application of the California some evidence rule, or was based on an unreasonable determination of the facts in light of the evidence presented to that court.  Register is entitled to relief.

## V.  ORDER

**IT IS HEREBY ORDERED THAT** the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 is **GRANTED**.

**IT IS FURTHER ORDERED THAT** the denial of parole is vacated and this matter is remanded to the California Board of Parole Hearings for further proceedings consistent with the decisions of the California Supreme Court in *In re Lawrence*, 190 P.3d 535 (Cal. 2008), and *In re Shaputis*, 190 P.3d 573 (Cal. 2008),[57] as interpreted by *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc),  *Pearson v. Muntz*, 606 F.3d 606 (9th Cir. 2010) (per curiam), *Cooke v.*

---

[55] Docket No. 21-1, p. 85.

[56] *See Cooke*, 606 F.3d at 1215.

[57] *See In re Prather*, 234 P.3d 541, 550-54 (Cal. 2010); *Haggard v. Curry*, --- F.3d ---, 2010 WL 4978842 at *4-*5 (9th Cir. December 9, 2010) (citing *Prather*).

*Solis*, 606 F.3d 1206 (9th Cir. 2010), and *Pirtle v. California Board of Prison Terms*, 611 F.3d 1015 (9th Cir. 2010).

**IT IS FURTHER ORDERED THAT**, if the Board of Parole Hearings has not held a hearing within 120 days of the date of entry of this Order, the Secretary, California Department of Corrections and Rehabilitation, must release Register to parole status.

**IT IS FURTHER ORDERED THAT** nothing in this Order is intended to, nor may it be construed as, restricting or otherwise inhibiting, directly or indirectly, the authority of the Secretary, California Department of Corrections and Rehabilitation, to set restrictions or conditions on the grant of parole to the extent otherwise provided by the laws of the State of California.

The Clerk of the Court is to enter final judgment accordingly.

Dated:  January 4, 2011.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge
